Filed 3/24/15  P. .v Sanders CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>STEPHEN CHARLES SANDERS,<br><br>     Defendant and Appellant. | D064746<br><br><br><br>(Super. Ct. No. SCD239270) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

In March 2013, a jury found Stephen Charles Sanders guilty of two counts of soliciting murder (Pen. Code, § 653f, subd. (b); counts 1 and 2; all further statutory references are to the Penal Code), soliciting robbery (§ 653f, subd. (a); count 3),

soliciting burglary (§ 653f, subd. (a); count 4) and soliciting a narcotic offense (§ 653f, subd. (d); count 5). Sanders waived his right to a jury trial on allegations, as to the first four counts, that he was out on bail when he committed the offenses (§ 12022.1, subd. (b)), and the court found the allegations true. In June, Sanders entered a negotiated guilty plea in case No. SCD235740 (Court of Appeal No. D064743); that plea bargain provided, as to that case, the instant case and three other cases, for a stipulated 25-year sentence and waiver of the right to appeal. In September, the court sentenced Sanders to 25 years in prison, including, in the instant case, two years (one third the middle term) on count 1 with two years for the bail enhancement, concurrent terms on counts 2, 3 and 4 and credit for time served on count 5. The court struck the remaining bail enhancements. Sanders appeals. We affirm.

BACKGROUND

On February 7, 2012, Sanders told Joseph Etcheverry, his former cell mate, about a kid who lived in a condominium complex where Sanders once lived. The kid was a marijuana dealer who always had from two to five pounds of marijuana in his home, with each pound worth $3,000. The dealer kept about $20,000 in "working money." Sanders told Etcheverry, "whatever he's got in his house, if we can get in his house we'll clean him out." Sanders also said the dealer kept money in a safe in his parents' home. Sanders had gone by the parents' home the previous night around dark and noted there were no cars and no dogs. Sanders suggested Etcheverry masquerade as a law enforcement agent, conduct a raid of the parents' home, tell the parents they were accessories to their son's drug dealing and take money from them. Sanders drove Etcheverry to the dealer's

2

condominium complex, said there was only one security camera, showed him how to get through the gate and pointed out the dealer's condo and car. Then Sanders drove Etcheverry to the parents' home. Stephens said their safe contained at least $50,000.

Sanders told Etcheverry he had $17,000 to buy four pounds of cocaine at a discount in Los Angeles. Sanders wanted to transport the cocaine to Hawaii. He said, "I can't take it myself, but I want to go over there so when someone flies over with it I can be able to catch it and then go give it to my boys . . . ." Etcheverry recommended Sanders use a woman named KK. Sanders suggested buying KK an airplane ticket on the Internet. Etcheverry and Sanders agreed that KK would hide the cocaine in balloons in her body cavities. Sanders said he had conducted a dry run by traveling to Hawaii "looking everywhere seeing if there's any feds on me."

On February 9, 2012, Sanders and Etcheverry again discussed crimes targeting the drug dealer and his parents. Sanders suggested the following. He and Etcheverry would have two-way radios. They would go to the dealer's condominium complex and wait for him to come home at night. When Sanders saw the dealer's car, he would radio Etcheverry. Etcheverry would walk up to the dealer, claim to be a law enforcement agent, zip tie his hands behind his back and say, "we have to search your house." Sanders listed the pros and cons of robbing the dealer before the parents and vice versa.

Etcheverry asked Sanders what they were going to do about Preston James, the victim in Court of Appeal No. D064743. (We grant Sanders's request for judicial notice of the record in that case.) Sanders replied, "I wanna fuckin' get his fuckin' ass if I can find out where he's at. I'm just, I'm gonna have my fucking silencer all dialed in and get

3

it all fuckin' hushed up and we'll fuckin' just deal with his fuckin' ass." Sanders said "I'll have everything figured—if we're gonna do that, I'll have everything figured out about it." Sanders said he had a lot of guns and a silencer. He had driven to the town where James was living with his father to familiarize himself with the area, and he planned to find out exactly where James's home was. Sanders told Etcheverry, "together we should be able to fuckin' get everything dialed." After killing James, Sanders planned to kill a female witness in the case in which James was a victim. Sanders had thought of "lobbin' a grenade through her bedroom window and fuckin' blowin' her up . . . ." Sanders was concerned if the female was killed first, the district attorney would realize he and Etcheverry were killing witnesses and their bail would be revoked. When Etcheverry asked if "there was someone else" in addition to James and the female, Sanders named Nick Neff, another victim.

Sanders said he had obtained two kilos of cocaine the previous night in Los Angeles. He showed Etcheverry where he kept it and asked if KK was willing to transport the cocaine. Etcheverry said yes. Sanders said he wanted to meet KK and discuss the matter with her and Etcheverry. Sanders and Etcheverry talked over how much they should pay KK and estimated how much cocaine they could hide in her body cavities. Sanders planned to take KK to the airport and be on the plane with her.

DISCUSSION

Appointed appellate counsel has filed a brief summarizing the facts and proceedings below. Counsel presents no argument for reversal, but asks this court to review the record for error as mandated by *People v. Wende* (1979) 25 Cal.3d 436

4

(*Wende*).  Pursuant to *Anders v. California* (1967) 386 U.S. 738 (*Anders*), counsel lists, as a possible, but not arguable, issue, whether the waiver of appellate rights was knowing, intelligent and voluntary.

We granted Sanders permission to file a brief on his own behalf.  He has done so and raises issues arising from the discovery and admission of evidence relating to surveillance and the recording of his conversations.  These matters occurred before Sanders's June 2013 plea agreement in case No. SCD235740, in which he waived his right to appeal in the instant case.  The waiver was knowing, intelligent and voluntary.  Sanders is thus precluded from raising the issues on appeal.

A review of the record pursuant to *Wende* and *Anders*, including the possible issue listed pursuant to *Anders*, has disclosed no reasonably arguable appellate issue.  Sanders has been competently represented by counsel on this appeal.

DISPOSITION

The judgment is affirmed.

McINTYRE, J.

WE CONCUR:


NARES, Acting P. J.


AARON, J.

5